This time we'll hear Rabin v. Dow Jones. Good morning. Good morning. May it please the Court, my name is Alexandra Shapiro, and I represent Stephen Rabin and Raymond Bacowar on this appeal. This Court has repeatedly held that because of their punitive nature, sanctions under 1927 and the Court's inherent powers should be imposed with restraint and discretion and only when the claims are both entirely without color and brought in bad faith. Here, neither condition was satisfied. First, the District Court committed legal error in purporting to find that the amended complaint was entirely without color. The Court made no specific findings on this point and instead merely reiterated its conclusion that the amended complaint had failed to state a claim for one of the three claims without explaining why they lacked color. As this Court has repeatedly held, the fact that a claim fails as a matter of law is not enough to show that it is utterly devoid of legal or factual merit, the standard for sanction. Weren't you relying on or requesting an extension of existing New York law? Yes, Your Honor, but this Court has previously held that there has to be no chance of success and no reasonable argument to extend the law in order for claim to be entirely without color and here there was a reasonable... Why would a federal court alter New York law under circumstances in which this federal court is obliged to follow New York law? Well, New York law, there was a reasonable basis to extend New York law and particularly for these types of torts. New York law determines whether there's a duty of care based on policy concerns and is notoriously evolving over time. Just to give an example, there are two cases we cite in our brief from the New York Court of Appeals involving situations where a patient leaves a hospital and then causes a motor vehicle accident and in one case, the Purdy case, where the patient had had a stroke and the after effects of the stroke caused her to be unable to drive the car with due care and someone was injured, the court held that there was no duty of care on the part of the hospital but then in the Davis case, virtually a very similar situation except it involved medication given to the patient and the court says there is a duty of care and I think those cases illustrate that this area of the law is evolving and it's perfectly reasonable for a plaintiff to try to extend the law and certainly, there was a good faith effort to do that here and indeed, if the court were to find something like that to be entirely without color and deserving of sanctions, it would chill the zealous representation and advocacy that this court has held are one of the reasons that sanctions are supposed to be sparingly implied and only in egregious cases. With regard to the second, and that's enough, if this court agrees that the claims were not entirely without color, then the sanctions order must be reversed because sanctions can only be justified if both prongs of the test are satisfied. But in addition, the conduct here did not amount to bad faith and indeed, we cite numerous cases at the end of our opening brief of the type of egregious circumstances in which this court has affirmed sanctions orders and we submit that . . . Well, I mean, the . . . I'm not sure why Dow Jones or any publisher would wish to cooperate in advance or combine to defraud their subscribers with the money going to somebody else. I mean, that doesn't sound even plausible, but in any event, your client became aware that Dow Jones had taken steps, measures to alert their subscribers and to hold the checks and your client never continued to allege things that are inconsistent with what your client either knew or had a duty to investigate. Your Honor, I respectfully disagree. I'm saying this is the finding and I wouldn't be surprised if you disagreed. Well, Your Honor, the evidence doesn't support the finding for the following reasons. First, the evidence in the record showed that at least for a period of six months between July of 2010 and, quote, unquote, early 2011, it's unclear exactly what month they were talking about, Dow Jones had been aware that there was a fraud but was continuing to cash the checks. And what our clients were told was that it was only in early 2011 that Dow Jones claimed it had started to hold checks. Secondly . . . What's the evidence that they knew before that? There's a cease and desist letter that they sent in July 2010, which is in the record and cited in the briefs. It's in the appendix. So there's that. In addition, there was . . . although it is true that appellants were aware that Dow Jones had published notices about this, that was later. And as far as appellants knew at the time, there was no evidence that Dow Jones was directly contacting affected subscribers and notifying them about the fraud and offering them the opportunity for a refund or otherwise. And in fact . . . so appellants reasonably believed that Dow Jones had been . . . that there was a reasonable argument that Dow Jones was aiding and assisting the fraud by not directly notifying the subscribers about this fraud. Why would Dow Jones do that? Why would somebody want to get their customers mad when they don't get anything out of it? Well, you know, clearly these were customers who were being defrauded, who were being ripped off by these fraudsters and being forced to pay twice as much as they were supposed to. They weren't being forced. They were defrauded. That's fair, Your Honor. I misspoke. But they were defrauded. They were misled into believing that these subscriptions were way more expensive than they really were. And indeed, the two other defendants settled the case and refunded all the money to the subscribers. And apparently . . . So they refunded all the money . . . they settled the case in this case? In this case. The other two defendants in this case . . . And they refunded what? They refunded subscriptions to defrauded subscribers. So your client was holed? No, but it was . . . first of all, it was a putative class action. So the settlements went to people who could have been class members had the case proceeded to that level. Dow Jones apparently, according to extra record material that it's cited, since the lawsuit has paid several million dollars to refund money to subscribers. So, I think it was perfectly reasonable for plaintiffs to believe that they should have notified subscribers so that subscribers did not continue to be misled by this fraud once they became aware of it. Particularly given that any other efforts to catch the fraudsters apparently were unsuccessful. Unless there are further questions, I'll reserve the remainder of my time for rebuttal. Thank you. Hillary Preston from Vincent and Elkins for Dow Jones. I want to touch upon a couple of things that have already been addressed. This is not an ordinary case where we have some simple mistakes or the way it's been portrayed in the appellate briefing is delays in discovery or common garden variety mistakes the plaintiff and the lawyer have made. What we actually have here is pretty sharp conduct.  Do you agree that if we were to determine that there was a colorable basis, that would be the end? Yes. Why don't you deal with that first? On the colorable basis. Because it sounds like you're going to bad faith first. I was going to start with bad faith, but I'll be happy to go to colorable basis. So, what Judge Rakoff relied upon was that the underlying theme for all three claims in the action was that there was a failure to act or a failure to protect theory. And what Judge Rakoff relied upon, and his decision is entitled, it's an abuse of discretion standard here. And what he relied upon was there were no facts in the complaint that supported a duty on Dow Jones to affirmatively go out and protect its subscribers from this type of activity. And he further noted that, in fact, between the time of the first complaint and the amended complaint, that the plaintiff was specifically made aware of extensive efforts that Dow Jones had undertaken to combat the fraud. Judge Rakoff relied upon that in saying, with those facts, it is not plausible, there is no colorable basis, on even just the facts, we set aside the law for a moment, on the facts that were known for plaintiff to continue to press the case that Dow Jones had failed in some duty to protect its subscribers from this fraud. Even retrospectively? I mean, look, I take it the part of the argument, but maybe I've misunderstood, was that at some point there was a failure to comply with this duty, to fulfill this duty, or a duty. Well, I think there's two questions. One is, is there a duty? Was there a duty to protect all? And Judge Rakoff found on that that there was not a duty. So there are three claims. There's an aiding and abetting the fraud claim. The question before us, whether there was on this record, or I guess it's a matter of New York law, a colorable basis to believe that there might be a duty, that there might be some issue about that? That's absolutely the question. And I think that when we look at what Judge Rakoff's reasoning was, he already determined there was not a duty. And his basis for determining that was that there was no argument for an extension of the law, as we've touched upon. There was no argument that there was this special relationship between a publisher and a subscriber that would give rise to the type of duty to protect that's being asserted here. And in contrast to the argument that just because there's not a case that supports them, they are therefore entitled to make this argument, there are affirmatively cases that go against them that we've cited in our briefing that say, as between a publisher and a subscriber, there is not a special relationship that could give rise to this type of duty. So it really is a situation where they had cases against them, but they were nevertheless trying to make an argument that a federal district court judge should extend New York law. And Judge Rakoff actually asked during oral argument, are you asking me to presume what the New York Court of Appeals would do if this question was presented to them? And plaintiff's counsel answered in the affirmative, acknowledging that this was something that the Court of Appeals had not addressed. What do you do with the aiding and abetting? The aiding and abetting claim requires that there is substantial assistance between the publisher and the entity actually committing the fraud. So here this group of entities that we refer to as CBS. And what the court found was there was nothing to suggest that there was an intent on the behalf of Dow Jones to assist in the fraud. And that's what you would have needed to sustain that substantial assistance. The intent. Intent. Specific intent. Yes. And that's, again, where he pointed back to the facts that the plaintiff was made aware of that made it inconsistent to allege that there was an intent to defraud when you're aware that someone's actively trying to combat the fraud. What good would it do for the subscriber, for Dow Jones, to hold those checks? After all, if there's a $20 subscription and someone was defrauded into writing a $40 check to CBS, and then CBS sends a $20 check to Dow Jones and says, please give this person a subscription, what good does it do to hold that check and not to give a subscription? Now somebody's out $40 and still doesn't get Phishing Weekly or whatever. The Wall Street Journal and Barron's for us. Whatever. I don't know that there is a precise benefit to the subscriber, but I'm not sure that's the question. So the checks were being held at the direction of law enforcement. Whether or not that yields a benefit for the subscriber is really not the question of whether or not we are then liable to them. If I could go back to the bad faith element, because I do think it's very important here, and it needs to be made clear exactly what happened. So the case is for alleged overpayment or payment for materials that were not received or that were received at a higher cost. In the case specifically against Dow Jones, there are five payments that were allegedly made, two for Wall Street Journal and three for Barron's. Before Mr. Rabin filed his amended complaint, he received checks from some entity that he associates with CBS that refunded his money for three of those five payments. He withheld that evidence from the defendants, withheld it completely. The only way that it came out was we engaged in non-party discovery. CBS made us aware of these checks. We went to plaintiff's counsel, confronted him with this situation, and the response we got was, I'm not aware of these checks at all. Later that afternoon, we got a call back that said, I am aware of the checks, and oh, by the way, I have them in my drawer. The checks were then produced. We then pursued additional information about how the checks got there, why they hadn't been produced, whether or not Mr. Rabin had actually called CBS in advance of filing his lawsuit. And we again told, no, he did not. He's never made any contact with CBS. And then he had not made any contact with CBS, and they sent him checks. His response to us in his request for admission response is that he had not made any contact with CBS. We later learned that not to be true, that when we pursued additional non-party discovery from CBS entities, they produced to us a call log that very clearly showed Mr. Rabin had contacted CBS. And he had contacted CBS with respect to a different publication, The Economist, saying, I didn't request this publication. I want a refund. He was advised, if you get a refund, it will be four to six weeks. Four to six weeks later, he got the three checks that I'm talking about. So the explanation that's being offered now as to why he didn't, why he did not produce that material previously, first, it was that we forgot. Second, it was, and this is in the record, we made a decision not to produce those checks because it undermined our case. It would impair my ability to be a class action representative. Why? It was just three checks out of five. Correct. Yes. Why would it impair the ability to be a class representative? He'd still be theoretically out some sum of money. Whether or not it actually impairs his ability to be a class representative would probably be a question for later in the proceedings. My point was, he made a decision to withhold relevant discovery because he viewed it as impairing his case. I mean, you started out saying this is not just a case about, you know, messed up discovery. Right. Because it's acknowledged in the record that it was an admitted decision to withhold evidence from the discovery process. And I think that that's not a garden variety situation. Unless Your Honors have additional questions. Thank you. Thank you. We'll hear rebuttal. Thank you, Your Honor. First of all, with regard to that last point, that's simply not true. There's no evidence in the record that anything was deliberately withheld. With regard to the contact from CBS, it's important. Did he not make the statement that was just described? He did not, Your Honor. There's an argument that he did not believe that the checks were relevant to whether he could be the class representative that was made. But there was no statement that the checks were deliberately withheld. What happened was, and actually, if I could just go back in context, because I think my opponent is trying to mix together this call with CBS and these checks, and there's really no evidence that they're connected in any way. There was a call in May where, which involved completely different publications, didn't involve these defendant publishers, whereby Mr. Rabin had been receiving The Economist magazine, which he did not order, and he called and asked them for a refund because he had not ordered that publication, and there's a document in the appendix. He didn't order it. How could he get a refund? He was apparently being charged for it or something like that. There's a document in the appendix, which is cited in the briefs, which is a call log, which describes that the call was about The Economist. It had nothing to do with the publications at issue in this case. And then two months later, shortly after the complaint was filed, these refund checks appeared, and the record shows that Mr. Rabin provided them to Mr. Bragar, and then when discovery was produced, Mr. Bragar unfortunately neglected to produce the checks. So that's what the record shows. But you just said earlier he didn't produce it because he didn't consider it relevant to the status of Mr. Rabin as a class representative. But, you know, if you could withhold documents that are called for on the theory that you don't consider it relevant, discovery would have very little purpose. Your Honor, that's not what the record shows. What the record shows is that — I'm just quoting you. No, no, no. What I said was that he neglected to produce the checks. It was a mistake. It was a mistake. It wasn't because he thought they weren't relevant. The telephone call, I think Mr. Rabin forgot about it, but he didn't consider the telephone call relevant because it didn't involve the publications at issue in this lawsuit or these defendants. And the last thing, two other very quick points, if I may, Judge Jacobs. I know my time is up. Go ahead. No, go ahead. Just the notion that it was at the direction of law enforcement that Dow Jones chose to hold those checks. I just want to remind the Court, and we discussed this in the reply brief, but this is not something that appellants were aware of at the time. That's something that was represented in the appellate briefs, but appellants were not aware of that reason at the time. Do you agree on the colorable basis issue that there was no argument made for an extension of New York law? No, I don't agree at all. I think that the very reason, and, in fact, the quote from the oral argument on the motion to dismiss that opposing counsel cited illustrates that there was an argument for extension because the point that Mr. Bragar was trying to make was that he was asking the Court to extend the law and to assume that the Court of Appeals might well recognize this proposed extension of the law. And there was no precedent for closing the argument. The precedents that Dow Jones cites involve a totally different type of case where the allegation is that there was a false statement in the publication as opposed to that the publisher was aiding and abetting a fraud to defraud subscribers of money. So I guess your argument is that there was nothing foreclosed, for example, an argument relating to the special relationship between a subscriber and a publisher? That's correct, Your Honor. Under New York law? That's correct. Thank you. Thank you both. We'll reserve decision.